# IN UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CLARENCE SLAUGHTER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| ROBERT WILKIE, | ) | |
| SECRETARY OF THE UNITED STATES | ) | |
| DEPARTMENT OF VETERANS AFFAIRS | ) | |
| 810 Vermont Avenue, N.W. | ) | |
| Washington, D.C. 20420 | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DISCRIMINATION

COMES NOW Plaintiff Clarence Slaughter, by and through undersigned counsel, and states as follows:

1. Plaintiff brings this action pursuant to Title VII and the Age Discrimination in Employment Act for discrimination, hostile work-environment and unlawful retaliation on the basis of race, color, and age in employment.

## JURISDICTION AND VENUE

2. Jurisdiction of this court is founded pursuant to 28 U.S.C. § 1331 and 29 U.S.C. §633(a).

3. Venue lies in this Court, pursuant to 42 U.S.C. § 2000e-5(f)(3) and 29 U.S.C. § 633(c) since the employment practices alleged to be unlawful were committed by defendant and its agents within the District of Columbia and it is a claim against an agency of the United States through its Secretary.

## PARTIES

4. Plaintiff, Clarence Slaughter ("Mr. Slaughter"), is a dark-skinned adult African-American male, a citizen of the United States and a bona fide resident of the state of Missouri. At all times alleged herein, Mr. Slaughter was over forty (40) years old. At all times further relevant herein, Mr. Slaughter is and was an employee of the United States Department of Veterans Affairs.

5. The United States Department of Veterans Affairs is a duly-authorized and organized agency of the United States of America with its headquarters located in Washington, D.C. The Department of Veterans Affairs is subject to the prohibitions against discrimination, retaliation and the creation and maintenance of a hostile work environment pursuant to Title VII of the United States Code.

## FACTS COMMON TO ALL COUNTS

6. From July 2005 to September 18, 2016, Clarence Slaughter, an African-American male, was a GS-14 Regional Manager for the Readjustment Counseling Service for the Midwest Region at the United States Department of Veterans Affairs.

7. Until 2016, RCS was organized around seven regions across the country. The most senior position in each region was that of the Regional Manager. Regional Managers were classified under Office of Personnel Management Series 101 and were required to have a degree in the behavioral sciences or ten years of equivalent experience and clinical licensure.

8. Mr. Slaughter, a disabled veteran who separated from the United States Military after 15 years due to his physical disability, possessed a bachelor's degree in Interdisciplinary Studies, a master's degree in social work and was duly licensed as a clinical social worker.

9. As a Regional Manager, Mr. Slaughter was initially responsible for 30 Vet Centers, 1 outstation, over 30 community access points across 11 states and 142 full-time employees, with 36 direct reports. Those direct reports included the team leaders of the individual Vet Centers, along with a regional team that consisted of Deputy Regional Managers, who had no supervisory duties outside those delegated by the Regional Manager in their absence, and other administrative and clinical support. Mr. Slaughter and the other Regional Managers reported directly to the Chief Officer of the RCS, a Senior Executive Service position who was based in Washington, D.C.

10. The Chief Officer of RCS was the selecting official for all Regional Manager and, later, District Director positions.

11. From 2009 until 2012, the Chief Officer of RCS was Alfonso Batres. Batres was assisted by various program managers and clinical officers, including Greg Harms, Charles Flora and Michael Fisher, all of whom were located in RCS's "Central Office" in Washington, D.C.

12. During Mr. Slaughter's tenure, he and his fellow GS-14 Regional Managers had, over time and as a result of the wars in Afghanistan and Iraq, acquired a significant increase in the complexity of services, duties, and responsibilities. Because of those "accretion of duties," in about January 2010, Dr. Batres received authority to reclassify and elevate the Regional Manager positions from a GS-14 grade to GS-15.

13. In 2010, one Regional Manager, Donald Smith, a white male, was promoted non-competitively as a GS-15 Regional Manager. Smith performed the same duties as Mr. Slaughter yet was the only Regional Manager promoted to GS-15. Although Smith's new GS-15 position description specifically enumerated certain duties, those were not "added" duties nor duties that

Mr. Slaughter did not also perform as a GS-14. Nor did Mr. Smith's series classification or the minimal education and experience qualifications for the job change.

14.     In short, Mr. Slaughter was performing the same duties as a GS-14 that Mr. Smith was performing as a GS-15.

15.     At about the time of Smith's promotion, RCS had only four Regional Manager positions filled with a permanent full-time employee out of a total of seven. Three of those Regional Managers were African-American men, Clarence Slaughter, John Walker and Dr. William Busby, and one was Louann Engle, a white female located in Dallas, Texas.

16.     Moreover, the incumbent GS-14 Regional Managers were not initially told about Smith's promotion, and no efforts were made to promote them or request a reclassification through a "desk audit" or other "mechanism" was utilized in Smith's promotion, notwithstanding RCS's granted authority to do so.

17.     The GS-14 incumbents complained, and RCS consistently told them that it was waiting on "HR."

18.     In 2010, John Walker left RCS, leaving only Mr. Slaughter, Ms. Engle and Dr. Busby as incumbent Regional Managers.

19.     In early 2011, RCS began recruiting within the VA for open Regional Manager positions in Maryland and Florida. RCS issued vacancy announcements recruiting the Regional Manager positions as a GS-14 grade. The position descriptions under the announcements were identical to the position description Clarence Slaughter was performing under as a GS-14.

20.     An African-American woman who had a pending EEOC complaint against RCS for its failure to promote her to other Regional Manager and Deputy Regional Manager positions

had applied and made the certificate of eligibles for the GS-14 Florida and Maryland Regional Manager positions.

21. That complainant had also made the certificate of eligibles for a concurrent external vacancy announcement for the GS-14 Florida position.

22. In an effort to impede the EEO complainant's efforts to compete for the Florida position, RCS urged Engle, the white female GS-14 Regional Manager in Dallas, to transfer to the open GS-14 Regional Manager position in Florida. When RCS refused to transfer Engle to the Florida Regional Manager position as a GS-15, she declined RCS's offer.

23. In 2011, Sarita Figueroa, a Hispanic woman and personal friend of Batres's, was recruited to be named-selected and transferred into the Florida Regional Manager position as a GS-14.

24. After RCS was advised that Figueroa, who did not have the education and experience for the position, would not be eligible for the position at any grade, RCS embarked on a campaign to tailor Figueroa's resume to fit Don Smith's position description.

25. For the first time ever, RCS requested that HR "reclassify" the Florida GS-14 Regional Manager position to GS-15. The text of the position description was identical to Don Smith's position description.

26. Because this was a newly reclassified position that did not have an incumbent GS-14, RCS was required to issue a competitive recruitment.

27. Moreover, instead of recruiting nationwide within the VA, RCS restricted the area of consideration to candidates already employed within the Florida/Caribbean geographic region. Because both the African-American female EEO complainant and Mr. Slaughter were employed

outside of that region, they were restricted from applying or otherwise being considered for the position.

28. Figueroa, Dr. Batres personal friend, was unsurprisingly hired as the GS-15 Regional Manager.

29. Both Figueroa and Mr. Slaughter carried the title of "Regional Manager," with the exact same duties, responsibilities, relative number of direct reports, and performance appraisal elements.

30. At some point in 2011, as well, RCS hired Steve Reeves as a GS-14 Regional Manager based in California. Mr. Reeves, a white male, did not have any college or post-graduate degrees when he was hired.

31. An anonymous complaint was lodged with the agency's Office of Inspector General regarding Figueroa's hire. An OIG investigation was launched, and in August 2012, a determination was made that Figueroa's hire was the result of prohibited personnel practices by RCS that provided her with an unfair advantage at the expense of the African-American candidate. RCS management officials in central office were referred to the Department of Justice for prosecution for making false statements during the course of the investigation.

32. Four months after the report was issued, Batres retired.

33. From Batres's retirement in 2012 until May 2016, RCS was led by a series of acting Chief Officers, including Don Smith, Dr. Busby, Charles Flora, from central office, and an employee from outside RCS, Tommy Stewart. Clarence Slaughter was never tasked with acting chief duties.

34. At the time of Batres's retirement, Mr. Slaughter, Ms. Engle, Dr. Busby, and Mr. Reeves were the only incumbent GS-14 Regional Managers.

35. The Maryland Regional Manager position remained vacant and Smith and Figueroa maintained their GS-15 grades.

36. By 2014, Mr. Slaughter was responsible for 46 Vet Centers, 53 direct reports, and 327 Full-Time Equivalent Employees ("FTEE"); Figueroa was responsible for 42 Vet Centers and 295 FTEE; Engle had 43 Vet Centers and 319 FTEE under her charge; Busby supervised 41 Vet Centers and 303 FTEE; Smith was in charge of 43 Vet Centers and 319 FTEE; and Reeves supervised 43 Vet Centers and 292 FTEE. In short, Mr. Slaughter was charged with operating the largest region in RCS.

37. From 2012 until 2015, Mr. Slaughter and the other GS-14 Regional Managers continued to be reassured by RCS that it was working with HR to effectuate the upgrades of the Regional Manager positions as previously authorized.

38. Notwithstanding such reassurance, there is no record evidence that RCS made any efforts to coordinate with HR to effectuate any reclassification of the GS-14 positions, although an organizational chart identifying each of the Regional Managers as GS-15s was approved in August of 2014.

39. At around the same time in August 2014, Mr. Slaughter received an email from his then supervisor, Charles Flora, who was based in the Washington, D.C. central office, and using hostile language, relieved Mr. Slaughter of his duties pertaining to negotiating leases for the Chicago Vet Center.

40. By 2015, the Department of Veterans Affairs reorganized into five distinct regions, known as the "MyVA Transformational Plan" and issued an agency-wide directive, including to RCS, to develop a plan to reorganized itself along the MyVA organizational

structure. The VA gave RCS no order as to how it should accomplish its reorganization nor mandate an upgrade or reclassification of any positions.

41. In about February 2015, RCS met with the GS-14 Regional Managers about the proposed reorganization. The Regional Managers were told that they would be non-competitively promoted per the 2009 authorization. The GS-14 Regional Managers were not told that they would be required to compete in order to keep their jobs.

42. By July 2015, Tommy Stewart had developed and submitted a plan pursuant to the MyVa reorganization. Stewart proposed that the seven regions be compressed into five districts along the same state boundaries realigned by the Transformational Plan.

43. Stewart represented that the RCS plan would be "budget neutral" and would require "no additional FTEE" or "staff relocation."

44. Stewart also advised that RCS would use the reorganization to "update the current regional office structure" by "shifting" the "direct daily supervision of Vet Center teams to appropriate *subordinate* staff, allowing the District Manager to concentrate on strategic planning, strategic implementation, and overall improvement of services to Veterans."

45. Finally, Stewart represented that "with current leadership vacancies, this proposal can be accomplished without relocation or *removal* of current regional leadership."

46. The "District Director" positions, further, would be at a GS-15 grade.

47. Under the proposed realignment, moreover, the newly-constituted Midwest District would be responsible for 54 Vet Centers, 19 Mobile Vet Centers and 374 FTEE.

48. On July 1, 2015, the Undersecretary of the Department of Veterans Affairs for Health approved the Stewart proposal.

49. Between July and October 2015, RCS worked with HR to develop position descriptions for the District Director position, as well as a position that would be titled "Deputy District Director."

50. Greg Harms, based in the Washington central office, took the lead and told the HR specialist that developing the District Director position description would be "easy" since it would be based on a GS-15 Regional Manager position description that had recently received "minor edits" in 2014.

51. By contrast, Harms related that developing the Deputy District Manager position would be more difficult since it was a "new position."

52. The resulting District Direct position did not add any duties that Regional Managers were already expected to perform under both GS-15 and GS-14 position descriptions.

53. Rather, the District Director position removed the Regional Managers' direct supervisory and "day to day" operational duties of the Vet Centers and transferred them to the newly formulated Deputy District Director position.

54. The District Directors would retain the Regional Managers' strategic planning and leadership oversight duties.

55. Clarence Slaughter was performing strategic planning and leadership oversight in his capacity as Regional Manager, as well as all of the duties that Don Smith and Sarita Figueroa were performing as GS-15s during the summer of 2015.

56. After the District and Deputy District Director position descriptions were complete, RCS engaged Charita Roman to "reclassify" the Regional Manager positions into GS-15 District Director positions.

57. By the fall of 2015, both William Busby and Don Smith had left the service and only three permanent Regional Managers were actually occupying the seven Regional Manager positions, Clarence Slaughter, Steve Reeves and Sarita Figueroa.

58. Roman understood Figueroa, an incumbent GS-15, would simply have her position description "redescribed."

59. Roman was not told that only two of the other six then regions were occupied and that no "person" would be "effected" if Slaughter and Reeves were non-competitively assigned into the District Director positions that corresponded with their respective regions. Nor was Roman advised that at least one of the Regional Manager positions, Maryland, had remained vacant since at least 2011.

60. Roman did not, in addition, make any comparison of the duties of the Regional Managers against the District Director positions to assess whether the District Director was a "new position." On the contrary, Roman found that the new District Director position description did not add any work not already performed by the Regional Managers. Rather, after determining that the reclassification was not based upon an "accretion of duties," Roman examined whether a non-competitive recruitment could be based upon a "planned management action." Based on her assumption that each of the seven Regional Manager positions were filled and that two employees would be adversely impacted by a noncompetitive reassignment, Roman advised that a non-competitive recruitment could not be based on a planned management action.

61. On October 28, 2015, RCS advised the incumbent Regional Managers for the first time that they would be required to compete for the four open GS-15 District Director positions.

62. The next day, a vacancy announcement was issued, and Clarence Slaughter applied.

63. Slaughter was minimally qualified for the position of District Director, and, although he made the certificate of eligibles, he was not originally referred to the selecting official, Tommy Stewart, until he complained to the Office of Personnel Management and RCS.

64. As a result of his complaints, Mr. Slaughter's application was referred to the selecting official.

65. By February 2016, Slaughter had been interviewed by a selection panel. Tommy Stewart soon left the agency. The certificate was returned unused without explanation.

66. Upon information and belief, Steve Reeves did not apply for nor was referred for selection under the October vacancy announcement.

67. In March 2016, RCS issued a new vacancy announcement for the four District Director positions, and Mr. Slaughter again applied for *each* position. Mr. Slaughter was referred for interviews by another selection panel.

68. In March 2016, Charles Flora, who was briefly assigned as the acting chief of RCS and accordingly the selecting official again relieved Mr. Slaughter from his duties overseeing the Sioux Falls Vet Center without cause or justification.

69. As a result of the adverse action by Flora and his concern about making a new certificate for the District Director position, in April 2016, Mr. Slaughter filed a complaint with the Office of Special Counsel against RCS management.

70. On May 23, 2016, Mr. Slaughter received a written counseling letter from Charles Flora.

71. In June 2016, appellant withdrew that complaint after he was referred to the interview panel.

72. Slaughter was not referred to the selecting official, the newly promoted permanent RCS Chief Officer, Michael Fisher. Fisher eventually hired Steve Reeves and two other external candidates to occupy three of the four open vacancies.

73. No one was hired for the fourth vacancy.

74. Of the then three incumbent Regional Managers at the time of the first vacancy announcement Mr. Slaughter, Sarita Figueroa and Steve Reeves, only Clarence Slaughter was not selected for any of the vacancies for District Director.

75. Of those incumbents, only Mr. Slaughter possessed any degree in the behavioral sciences or a clinical license.

76. Indeed, Mr. Reeves did not possess *any* degrees upon his promotion and, as OIG found, Figueroa had received her original placement illegally.

77. Clarence Slaughter, in addition, possessed seven years more experience in the Regional Manager position than both Figueroa and Reeves and had supervised the largest region within RCS at the time of the selection process.

78. Mr. Slaughter knew his position as Regional Manager was being eliminated and received no response from Fisher about his employment status during the summer of 2016.

79. Accordingly, Mr. Slaughter re-submitted his complaint alleging prohibited personnel practices by RCS and VA Central Office leadership and filed a complaint before the Merit System Protection Board, as well as the Office of Special Counsel in July 2016 and initiated EEO counseling on or about July 22, 2016.

80. On August 24, 2016, Mr. Slaughter filed a formal complaint of discrimination and hostile work environment for Charles Flora's refusal to authorize special contributions awards, Flora's hostile treatment relating to the St. Louis Vet Center and efforts to marginalize his work,

the failure to promote him to the GS-15 District Director position, and Mr. Fisher's refusal to discuss Mr. Slaughter's employment status fowling his non-selection.

81. In September of 2016, Fisher finally advised Mr. Slaughter that he could accept a reassignment to a GS-14 Deputy District Director position or be terminated. Mr. Slaughter chose to remain employed.

82. In sum, Mr. Slaughter was permanently reassigned to the position of Deputy District Director which is classified at a lower grade than the District Director position to which he was otherwise qualified for promotion.

83. Mr. Slaughter no longer directly reported to a SES supervisor, but a GS-15. As a result of his demotion, instead of 46 Vet Centers, Mr. Slaughter was assigned to 18. And, after supervising 327 FTEE, Mr. Slaughter was charged with supervising 120 after his demotion.

84. RCS eventually issued a competitive announcement to fill the Deputy District Director positions. Of the then incumbent Deputy Regional Managers, every last one of them was selected and promoted to the GS-14 Deputy District Director position.

85. A younger individual with substantially less experience than Mr. Slaughter and from outside RCS and the geographic territory of the Midwest District 3, Roberto Reid, was selected as the District Director for Mr. Slaughter's former territory.

86. On November 8, 2016 until January 2017, Reid stripped Mr. Slaughter of all of his duties as Deputy District Director.

87. Specifically, Reid and Fisher have refused to allow Mr. Slaughter to select or staff his direct team members and ignored his complaints about this reduction of his duties

88. On December 22, 2016, Mr. Slaughter amended his formal EEO complaint, adding allegations relating to the stripping by Reid of his duties.

89. On May 3, 2017, Reid subjected Mr. Slaughter to an investigation surrounding alleged wrongdoing by the Office of Inspector General Administrative Board of Investigations (AIB).

90. The AIB investigation found the complaint(s) against Mr. Slaughter "unsubstantiated." On August 7, 2017, Mr. Reid has nonetheless continued to stripped Mr. Slaughter of all of his substantive duties, precluded him from having any contact with his subordinates or any Vet Centers assigned to his zone and sought to expand the AIB investigation beyond its original scope.

91. On August 9, 2017, Mr. Reid issued Mr. Slaughter's 2016 performance review although he was ineligible to appraise Mr. Slaughter's performance because he had only supervised him for six calendar days during the review year.

92. On August 24, 2017, Mr. Slaughter initiated additional EEO counseling resulting in the lodging of a formal complaint that alleged discrimination, retaliation and hostile work environment for the refusal by Michael Fisher and Reid to authorize Mr. Slaughter's hire of necessary staff, the subjection by Reid of an unwarranted AIB investigation and an unexplained expansion of that investigation after the charges were found unsubstantiated, the issuance of a performance evaluation by Reid, and Reid's 2018 fully satisfactory performance rating.

93. On September 28, 2017, and November 9, 2017, the MSPB conducted a hearing on Mr. Slaughter mixed claim relating to his non-selection to the GS-15 District Director position. In that hearing, as well as pleadings leading up to it, Mr. Slaughter raised questions about the propriety of Figueroa and Reid's hire.

94. On January 2, 2018, Reid rated Mr. Slaughter's performance as fully successful after Mr. Slaughter complained about Reid's original "minimally satisfactory" rating.

95. On January 8, 2018, Reid informed Mr. Slaughter of yet another AIB investigation into alleged misconduct.

96. On January 10, 2018, Mr. Slaughter was interviewed by an AIB panel based upon allegations raised by a former direct report of Mr. Slaughter's. The lead panel member was Sarita Figueroa. During his testimony, Mr. Slaughter, believing his testimony to be confidential, spoke about sensitive matters relating to the witness against him and her potential motive to lie. Mr. Slaughter also raised questions during the interview about the appearance of bias by at least one member of the panel.

97. A few weeks later, Mr. Slaughter received a copy of his AIB transcript. It had been forwarded to him by an individual designated by Ms. Figueroa to handle the administrative tasks of the AIB investigation into Mr. Slaughter's conduct. Inexplicably, Ms. Figueroa assigned the administrative tasks to the *witness* whose testimony formed the basis for the investigation.

98. Mr. Slaughter objected to the witness having access to information and testimony as a result of her administrative role and strongly asserted that any additional information offered by the witness was hopelessly compromised and tainted by her unfettered access to Mr. Slaughter's testimony.

99. Mr. Slaughter, as well, again raised questions about the objectivity of the AIB investigation as a whole.

100. Since August 7, 2017 until the present, Mr. Slaughter has done no work consistent with his job description or series.

101. On May 16, 2018, the MSBP found that it did not have jurisdiction over Mr. Slaughter's failure to promote and advised his right to pursue his discrimination claims in District Court.

102. More than 180 days have elapsed since the filing of his complaints of discrimination with the EEOC.

103. Accordingly, Mr. Slaughter has exhausted his administrative remedies.

## FIRST CAUSE OF ACTION
### Violation of Title VII – Race and Color Discrimination

104. Plaintiff herein adopts and incorporates by reference all the allegations set forth in paragraphs "1" through "103" as if originally pleaded herein.

105. Defendant, through its agents or supervisors, unlawfully discriminated and denied equal employment opportunities for promotion and other terms and conditions of employment against Ms. Slaughter because of his race and sex when it failed to promote him to positions in which he was qualified, without cause of justification, in violation of Title VII of the Civil Rights Act of 1964, as amended.

106. As a direct and proximate result of the illegal employment discrimination by Defendant, Mr. Slaughter has suffered, and continues to suffer, severe pain and suffering and extreme mental anguish and emotional distress. Mr. Slaughter has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities.

WHEREFORE plaintiff respectfully prays this Court:

(a) To award him, under Title VII of the Civil Rights Act, all the back and front pay and fringe benefits he has lost as a result of defendant's unlawful discrimination against him;

(b) To award him, under Title VII of the Civil Rights Act, compensatory damages in an amount to be determined at trial;

(c) To award him, under Title VII of the Civil Rights Act, a position consistent with his experience and training as if he had been initially promoted in 2010;

(d) To award him reasonable attorney's fees and costs of this action; and

(e) To award him such other and further relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION
**Violation of ADEA – Age Discrimination**

107. Plaintiff herein adopts and incorporates by reference all the allegations set forth in paragraphs "1" through "106" as if originally pleaded herein.

108. Defendant, through its agents or supervisors, unlawfully discriminated and denied equal employment opportunities for promotion and other terms and conditions of employment against Mr. Slaughter because of his age when it failed to promote him, though he was qualified and a less qualified younger candidate was promoted in his stead, without cause of justification, in violation of the ADEA.

109. As a direct and proximate result of the illegal employment discrimination by Defendant, Mr. Slaughter has suffered, and continues to suffer a loss of earnings and other employment benefits and job opportunities.

WHEREFORE plaintiff respectfully prays this Court:

(a) To award him, under the ADEA, all the back and front pay and fringe benefits he has lost as a result of defendant's unlawful discrimination against him;

(b) To award him reasonable attorney's fees and costs of this action;

(c) To award him, under the ADEA, a position consistent with her experience and training as if he had been initially promoted in 2010; and

(c) To award him such other and further relief as this Court deems just and proper.

## THIRD CAUSE OF ACTION
**Violation of Title VII – Retaliation**

110.     Plaintiff herein adopts and incorporates by reference all the allegations set forth in paragraphs "1" through "109" as if originally pleaded herein.

111.     By the actions set out above, defendant has denied Mr. Slaughter the rights and privileges secured by Title VII, when it denied him professional opportunities and promotions for which he was qualified, without cause or justification, because he had engaged in protected activity under the United States Civil Rights Act.

112.     As a direct and proximate result of the illegal employment action by Defendant, Mr. Slaughter has suffered, and continues to suffer, severe pain and suffering and extreme mental anguish and emotional distress. Mr. Slaughter has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities.

WHEREFORE plaintiff respectfully prays this Court:

(a)     To award him, under Title VII of the Civil Rights Act, all the back and front pay and fringe benefits he has lost as a result of defendant's unlawful discrimination against him;

(b)     To award him, under Title VII of the Civil Rights Act, compensatory damages in an amount to be determined at trial;

(c)     To award him, under Title VII of the Civil Rights Act, a position consistent with his experience and training as if he had been initially promoted in 2010;

(d)     To award him reasonable attorney's fees and costs of this action; and

(e)     To award him such other and further relief as this Court deems just and proper.

## FOURTH CAUSE OF ACTION
**Violation of ADEA – Retaliation**

113. Plaintiff herein adopts and incorporates by reference all the allegations set forth in paragraphs "1" through "112" as if originally pleaded herein.

114. By the actions set out above, defendant has denied Mr. Slaughter the rights and privileges secured by the ADEA, when it denied him professional opportunities and promotions for which he was qualified, without cause or justification, because he had engaged in protected activity under the ADEA.

115. As a direct and proximate result of the illegal employment action by Defendant, Mr. Slaughter has suffered, and continues to suffer, a loss of earnings and other employment benefits and job opportunities.

WHEREFORE plaintiff respectfully prays this Court:

(a)     To award him, under the ADEA, all the back and front pay, fringe benefits and expenses he has lost as a result of defendant's unlawful discrimination against him;

(b)     To award him, under Title VII of the Civil Rights Act, a position consistent with his experience and training as if he had been initially promoted in 2010;

(c)     To award him reasonable attorney's fees and costs of this action; and

(d)     To award him such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff respectfully requests a jury trial on all issues.

                    Respectfully submitted,

                    CKR LAW, LLP

                    By:    */s/ Lisa Alexis Jones*
                              Lisa Alexis Jones, Esq.
                    1330 Avenue of the Americas
                    14th Floor
                    New York, N.Y.  10019
                    (212) 259-7300
                    (212) 259-8200 (Fax)
                    ljones@ckrlaw.com

                    *Counsel for Clarence Slaughter*

Dated: June 4, 2018