UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CLARENCE SLAUGHTER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 18-1318 (RBW) |
| ) | |
| DENIS MCDONOUGH,[1] in his official ) | |
| capacity as Secretary of the United States ) | |
| Department of Veterans Affairs, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

On June 4, 2018, the plaintiff, Clarence Slaughter, initiated this civil action against the defendant, Denis McDonough, in his official capacity as Secretary of the United States Department of Veterans Affairs (the "Department" or the "VA"), alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e-2 to -7, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634.  See First Amended Complaint for Discrimination ("Am. Compl.") ¶¶ 125–48, ECF No. 39.  Currently pending before the Court is the plaintiff's Motion to Compel Discovery ("Pl.'s Mot." or "the plaintiff's motion to compel"), ECF No. 49.  Upon careful consideration of the parties' submissions,[2] the Court concludes for the following reasons that it must deny the plaintiff's motion to compel.

---

[1] Denis McDonough is the current Secretary of the United States Department of Veterans Affairs, and he is therefore substituted for Robert Wilkie as the proper party defendant pursuant to Federal Rule of Civil Procedure 25(d).

[2] In rendering its decision regarding the plaintiff's motion to compel, the Court also considered the following filings: (1) the defendant's Opposition to Plaintiff's Motion to Compel Discovery ("Def.'s Opp'n"), ECF No. 52; (2) Def.'s Opp'n, Exhibit ("Ex.") 1 (Declaration of Doris L. Gruntmeir ("Gruntmeir Decl.")), ECF No. 52-1; (3) the Plaintiff's Reply Memorandum in Support of his Motion to Compel Discovery ("Pl.'s Reply"), ECF No. 53; and (4) the

(continued . . .)

I.     BACKGROUND

A.     Factual Background

The plaintiff, Clarence Slaughter, filed his Complaint on June 4, 2018, see Complaint ("Compl."), ECF No. 1, and later filed an Amended Complaint on March 11, 2021, see Am. Compl.  The plaintiff represents that he is a "dark-skinned [ ] African-American male," and, at all times relevant to the allegations in his complaint, was "over forty (40) years old."  Id. ¶ 4.  The plaintiff "is and was an employee of the United States Department of Veterans Affairs[,]" id., serving "[f]rom July 2005 to September 18, 2016, . . . [as] a GS-14 Regional Manager for the Readjustment Counsel Service for the Midwest Region[,]" id. ¶ 6.  The plaintiff contends that he was not promoted and was constructively demoted based on his race, see id. ¶¶ 125–27, and his age, see id. ¶¶ 128–30; and was the victim of retaliation, see id. ¶¶ 131–36.

Most relevant to the plaintiff's motion to compel is his allegation that he received a notice of his proposed termination that he contends constructively terminated his employment in retaliation for his protected activity pursuant to Title VII and the ADEA, namely, the filing of an equal employment opportunity ("EEO") complaint.  See id. ¶¶ 137–48; see also Pl.'s Mot. at 1 ("During the summer of 2016, [the plaintiff] . . . filed an internal administrative EEO complaint, as well as a complaint before the Merit Systems Protection Board [("MSPB")], following his non-selection . . . and subsequent constructive demotion by [the d]efendant[.]").  Specifically, the plaintiff alleges that, shortly before he received a final administrative adjudication regarding a complaint before the MSPB, see Am. Compl. ¶¶ 112, 114, "the VA's Office of Accountability

---

(. . . continued)
defendant's Sur-reply to Plaintiff's Reply in Support of Motion to Compel Discovery ("Def.'s Surreply"), ECF No. 55.

and Whistleblower Protection ("OAWP") contacted [Roberto] Reid[, the plaintiff's supervisor,] out of the 'blue,' told him that [the plaintiff] was going to be terminated[,] and directed [Reid] to issue a notice of proposed removal to [the plaintiff]." Id. ¶ 116.  The plaintiff states that "[o]n April 11, 2018, the United States Office of Special Counsel ("OSC") sent . . . attorneys in the VA's Office of General Counsel [("OGC")] [ ] a request that the VA take 'disciplinary action' against [the plaintiff] for his 'role' in retaliating against a former second-line subordinate[.]" Pl.'s Mot. at 3.  Furthermore, between April 2018 to March 2019, "various offices, . . . including [the] OGC, the [OAWP][,] and the proposing official, . . . Reid, discussed: 1) OSC's recommendation for disciplinary action; 2) whether and to what extent OSC's recommendation would be sustained[,] and 3) what, if any, discipline would be proposed." Id.  Finally, "[i]n March 2019, [the] OAWP issued a formal recommendation that [the plaintiff] be terminated, and on March 7, 2019, Reid served on [the plaintiff] a Notice of Proposed Termination."³ Id.; see also Pl.'s Mot., Exhibit ("Ex.") 4 (Notice of Proposed Termination ("OAWP Termination Notice")), ECF No. 49-2.

**B.      Procedural Background**

The parties commenced discovery in this case on May 8, 2019.  See Order (May 8, 2019), ECF No. 16.  On October 12, 2021, the plaintiff filed his motion to compel, seeking production of "documents and information redacted or withheld by [the d]efendant . . . on the basis of various privileges, including the attorney-client, attorney work-product, and 'deliberative process' privileges, as well as relevance[,]" Pl.'s Mot. at 1, material which consists of the communications and documents exchanged between the OSC and the OAWP that resulted in the

---

³ The plaintiff retired on April 27, 2019, before the termination took effect, see Am. Compl. ¶ 123; thus, the plaintiff alleges "proposed termination" and "constructive discharge" as the adverse employment actions underlying his retaliation claims, see id. ¶ 124.

notice of proposed removal issued to the plaintiff, id. at 3–5.  The plaintiff also seeks "basic comparator information of instances of termination recommendations by [the] OAWP . . . and referrals by [the] OSC of disciplinary actions[.]"  Id. at 10.  According to the plaintiff, in response to his discovery demands, the defendant "lodged a series of objections on the basis of attorney-client, attorney work-product[,] and the so-called deliberative process privileges."  Id. at 3.  The defendant contends that he "eventually produced heavily redacted documents of correspondence between agency counsel, the [plaintiff's supervisors,] and members of the OAWP[,]" and "[o]n September 10, 2021, produced a privilege log containing [thirty-three] separate entries of documents that had previously been produced with redactions."  Id. at 4.  The defendant did not, however, "produce nor provide a privilege log of drafts of [the] OAWP's termination recommendation or the Notice of Proposed Termination[.]"  Id.  The plaintiff argues that the documents he requested are not protected under any of the privileges invoked by the defendant.  See id. at 5.

       The defendant filed his opposition to the plaintiff's motion to compel on October 26, 2021, see generally Def.'s Opp'n; the plaintiff filed his reply on November 2, 2021, see generally Pl.'s Reply; and the defendant was granted leave to file a surreply on November 12, 2021, see generally Def.'s Surreply.  On December 3, 2021, the Court held a hearing on the plaintiff's motion to compel.  See Min. Entry (Dec. 3, 2021).  In light of the plaintiff's assertion that the "[d]efendant's claims of privilege cannot be sustained without in camera review by the Court[,]" Pl.'s Mot. at 7, the Court reserved its ruling on the plaintiff's motion pending its review of the privilege log and redacted documents produced to the plaintiff by the defendant during discovery.

## II.     STANDARD OF REVIEW

Discovery in civil cases in federal courts is governed by Federal Rules of Civil Procedure 26 through 37.  See Fed. R. Civ. P. 26–37.  Pursuant to Rule 37, a party seeking discovery may move for an order "compelling an answer, designation, production, or inspection" from a party who fails to produce requested documents.  Fed. R. Civ. P. 37(a)(3)(B).  Generally, "[t]he party moving to compel discovery has the burden of proving that the opposing party's answers were incomplete[,]" Equal Rts. Ctr. v. Post Props., Inc., 246 F.R.D. 29, 32 (D.D.C. 2007), "[h]owever, a party asserting a privilege or work-product protection bears the burden to establish that the privilege applies[,]" United States v. All Assets Held at Julius Baer & Co., 169 F. Supp. 3d 54, 56 (D.D.C. 2015).  The party asserting a privilege meets this burden by "adduc[ing] competent evidence in support of its claims, [that amounts to] something beyond conclusory statements, generalized assertions, and unsworn averments of its counsel."  Fed. Trade Comm'n v. Boehringer Ingelheim Pharms., Inc., 180 F. Supp. 3d 1, 16 (D.D.C. 2016) (internal quotation marks omitted); see Alexander v. Fed. Bureau of Investigation, 192 F.R.D. 42, 45 (D.D.C. 2000) ("[T]he party asserting the attorney-client privilege . . . must demonstrate the applicability of the privilege by way of affidavits or other competent evidence." (internal quotation marks omitted)).

## III.    ANALYSIS

The discovery sought by the plaintiff concerns communications and material exchanged between the OGC and the OAWP that concern the plaintiff's proposed termination, see Pl.'s Mot. at 3–5; Def.'s Opp'n at 2–3; see also supra Section I, as well as comparator information, see Pl.'s Mot. at 10–11.  The defendant claims that the documents regarding communications between the OGC and the OAWP are exempt from disclosure under three privileges: attorney-

5

client, see Def.'s Opp'n at 5, attorney work-product, see id. at 8 n.4, and deliberative process, see id. at 9.[4]  The defendant also argues that the plaintiff has not presented a valid request for compactor information.  See id. at 11.  Before the Court may evaluate the applicability of the defendant's asserted privileges, it must address whether in camera review is needed.  Accordingly, the Court will proceed by addressing: (1) whether in camera review is needed to evaluate the application of the defendant's asserted privileges; (2) whether the defendant's asserted privileges apply; and (3) whether the plaintiff is entitled to the production of comparator information.

A.     Whether In Camera Review is Necessary

The plaintiff argues that "[the d]efendant's claims of privilege cannot be sustained without in camera review by the Court."  Pl.'s Mot. at 7.  In response, the defendant states that the plaintiff "makes three generalized arguments to justify his request for in camera inspection

---

[4] The defendant also argues that the information sought by the plaintiff is not relevant to his case.  See Def.'s Opp'n at 5.  Specifically, the defendant argues that the plaintiff fails to establish
> how communications involving legal counsel (i) after [the] OSC found, on April 11, 2018, that [the p]laintiff engaged in whistleblower retaliation and informed the VA that [the p]laintiff needed to be disciplined and (ii) after [the] OAWP was working on a letter proposing [the p]laintiff's removal would be relevant to [the p]laintiff's case.

Id. (emphasis in original).  In response, the plaintiff contends that "[t]he decision to terminate [the plaintiff] was [the d]efendant's, and the decision-making process by which that determination was made is indisputably relevant."  Pl.'s Reply at 4 (emphasis in original).

In light of the plaintiff's inclusion of constructive termination claims in his Amended Complaint, the events leading to the termination have a clear bearing on these claims.  Both the plaintiff and the defendant seem to agree that, between April 11, 2018, when the OSC recommended that the VA take disciplinary action, and the March 7, 2019 issuance of the notice of proposed termination, the OGC and the OAWP engaged in discussions that led to the eventual decision to terminate the plaintiff.  See Pl.'s Mot. at 3; Def.'s Opp'n at 2–3.  Thus, contrary to the defendant's position that the decision had already been made by April 11, 2018, the Court concludes that the period between April 2018 and March 2019 are relevant to the plaintiff's eventual termination, which is the subject of multiple claims put forth in his Amended Complaint.  Therefore, construing the meaning of "relevance" broadly as required in the discovery context, see Jewish War Veterans of the U.S., Inc. v. Gates, 506 F. Supp. 2d 30, 42 (D.D.C. 2007), the Court concludes that the materials which the plaintiff seeks are relevant to his claims regarding constructive termination.  Because the communications and materials produced between the OGC and OAWP during this time period constituted the ultimate decision-making process that led to the plaintiff's constructive termination in March 2019, they "w[ould] have some probable effect on the organization and presentation of the [plaintiff's] case[,]" Smith v. Schlesinger, 513 F.2d 462, 473 (D.C. Cir. 1975), as it pertains to his claims involving constructive termination, and are therefore relevant.

and production[,]" "misrepresent[ing] the privilege log to suggest that it is somehow deficient[,] . . . speculat[ing] that VA legal counsel may be providing human resources advice rather than legal advice[,] . . . [and] incorrectly argu[ing] that [the] OAWP is unable to obtain legal services from VA's OGC." Def.'s Opp'n at 5. The defendant argues that the totality of the evidence it has presented, including its privilege log and redacted documents, "indicate[s] that the VA properly redacted attorney-client privileged communications[.]" See id. at 8.

When a protective privilege is asserted in the course of discovery, "the general objection that, for example, a request for production of documents calls for the production of documents which are privileged is condemned as insufficient." Avery Dennison Corp. v. Four Pillars, 190 F.R.D. 1, 1 (D.D.C. 1990). However, "[c]aution and the need to eliminate even the potential for prejudice to the holder of the privilege, require that in camera inspection never be any greater than absolutely necessary[,]" Nat'l Lab. Rels. Bd. v. Jackson Hosp. Corp., 257 F.R.D. 302, 307 (D.D.C. 2009). In part to avoid the overuse of in camera inspection, the filing of a privilege log is "the universally accepted means of asserting privileges in discovery in the federal courts[,]" Avery Dennison Corp., 190 F.R.D. at 1, and in determining whether to order in camera review of the documents at issue, a court will evaluate the sufficiency of the privilege log, see Nat'l Lab. Rels. Bd., 257 F.R.D. at 306–08. Pursuant to Federal Rule of Civil Procedure 26(b)(5)(A)(ii), the privilege log must "describe the nature of the documents . . . not produced . . . and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to address the claim." Fed. R. Civ. P. 26(b)(5)(A)(ii). To meet this sufficiency standard, "privilege logs generally should 'state the basis upon which the privilege is claimed, state the subject matter, number of pages, author, date created, and the identity of all persons to whom the original or any copies of the document were shown or provided.'" Jones v. Carson, No. 15-310,

7

2018 WL 11410070, at *5 (D.D.C. Mar. 30, 2018) (quoting Loftin v. Bande, 258 F.R.D. 31, 33 (D.D.C. 2009)). Furthermore, "the Court does not leave its common sense at the door when it examines a privilege log" and may draw on context to make "legitimate inferences . . . from an entry in a privilege log[.]" Nat'l Lab. Rels. Bd., 257 F.R.D. at 307; see id. ("The context of the creation of the document, for example, viewed from the perspective of the history of the litigation, may permit reasonable inferences about the document that eliminate the need for in camera inspection.").

      Here, the Court has reviewed the defendant's privilege log, see Pl.'s Mot., Ex. 6 ("Privilege Log"), ECF No. 49-2, along with the redacted documents submitted by the defendant and filed by the plaintiff. The Court finds that the privilege log is reasonably detailed, in that it contains all the information needed to adequately describe the documents at issue. See generally id., Ex. 6 (Privilege Log) (providing information regarding number of pages, date, name of sender, name of recipient, and description of document, including a brief description of the subject matter and basis upon which a particular privilege is claimed); Loftin, 258 F.R.D. at 33 (listing necessary elements of a sufficiently detailed privilege log). The Court also agrees with the defendant that, considering the content of the privilege log, "the redacted documents, and [the] timeline of events[,]" Def.'s Opp'n at 8, collectively, there is sufficient information to ascertain the nature of the documents at issue for purposes of a privilege determination. Accordingly, the Court will not resort to in camera review, see Nat'l Lab. Rels. Bd., 257 F.R.D. at 308 ("In camera review, because of the burden it places on the Court, should be the exception, and not the norm."), and instead will proceed to its evaluation of the defendant's claims of privilege.

B.     The Defendant's Asserted Privilege Claims

1. **Whether an Attorney-Client Relationship Exists**

As a preliminary matter, the plaintiff argues that, because the "OAWP is required to operate independently from the agency's OGC[,]" Pl.'s Mot. at 9 (citing 38 U.S.C. § 323(e) ("[T]he Office shall not be established as an element of the Office of the General Counsel and the Assistant Secretary may not report to the General Counsel.")), there is no valid attorney-client relationship between the OAWP and the OGC and therefore, "communications between agency counsel and [the] OAWP staff are not protected communications," id. (emphasis omitted).  The plaintiff contends that, through the OAWP's enabling statute, "Congress specifically precluded any representative relationship between agency counsel and [the] OAWP[.]" Id.  Thus, under the plaintiff's argument, any purported attorney-client relationship between the OAWP and the OGC would be statutorily proscribed and therefore invalid.  See Pl.'s Reply at 7 (stating that, although the plaintiff "does not contest that [the OGC has provided the OAWP with legal counseling since the OAWP's inception]," "[a]gency [c]ounsel's [a]dvice to OAWP [v]iolated 38 U.S.C. § 323").

In response, the defendant distinguishes between the prohibition against the OAWP <u>reporting to</u> the OGC versus the OAWP <u>seeking legal advice from</u> the OGC, arguing that "[t]he fact that, as a matter of structure, Congress directed that [the] OAWP not be housed within 'the [OGC]' and not report to the VA's General Counsel, does not mean that [the] OAWP cannot be a 'client' utilizing the legal services of [the] OGC[.]" Def.'s Opp'n at 7 (citation omitted).  The defendant further states that "[t]he fact is that [the] OGC provides legal services to [the] VA and its component organizations, such as [the] OAWP, and [the] OGC has provided legal support and advice to [the] OAWP since its inception." Id.; see also id. at 7–8 ("This is a common structure in federal agencies." (citing Story of Stuff Project v. U.S. Forest Serv., 345 F. Supp. 3d 79, 96

(D.D.C. 2018))).  To support this contention, the defendant cites to the Declaration of Doris L. Gruntmeir, Chief Counsel of the OGC's Personal Law Group, which the defendant submitted with his opposition.  See Declaration of Doris L. Gruntmeir ("Gruntmeir Decl.") ¶ 2, ECF No. 52-1 ("[The] VA is [the] OGC's client, and the [OAWP] is, and has been since its inception, a component of the VA to whom [the] OGC provides legal support and advice.").

While the enabling statute prohibits an accountability or reporting structure between the OAWP and the OGC, it does not preclude an attorney-client relationship.  See 38 U.S.C. § 323(e) ("The [OAWP] shall not be established as an element of the [OGC] and the Assistant Secretary may not report to the General Counsel.").  If Congress had intended for this statutory provision to preclude an attorney-client relationship, it would have made that prohibition explicit.  See Shaw v. Delta Air Lines, Inc., 436 U.S. 85, 97 (1983) ("We must give effect to the plain language [of a statute] unless there is good reason to believe Congress intended the language to have some more restrictive meaning.").  Furthermore, the structure, vis-à-vis between the OAWP and the OGC, "is a common structure in federal agencies[,]" Def.'s Opp'n at 7–8 (citing Story of Stuff Project v. U.S. Forest Serv., 345 F. Supp. 3d 79, 96 (D.D.C. 2018)), and the Courts of this Circuit have consistently held communications between agency counsel and components of the agency are protected by the attorney-client privilege, see, e.g., Town of Norfolk v. U.S. Army Corps of Eng'rs, 968 F.2d 1438, 1458 (D.C. Cir. 1992); Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 863 (D.C. Cir. 1980); Gen. Elec. Co. v. Johnson, No. 00-cv-2855 (JDB), 2006 WL 2616187, at *14–15 (D.D.C. Sept. 12, 2006).  Accordingly, the Court finds that there is an attorney-client relationship between the OAWP and the OGC.

### 2. Attorney-Client Privilege

The plaintiff argues first that the material at issue is not protected by the attorney-client privilege because, "[h]aving eliminated the VA's human resources personnel from the discussions, agency counsel was providing nothing more than traditional [human resources] advice regarding a personnel matter."  Pl.'s Mot. at 8.  In response, the defendant states that "the OGC generally and attorney Aaron Robison specifically were engaged to conduct and [were] conducting 'legal review of the proposed personnel action against Clarence Slaughter' for OAWP and the proposing official[,]" Def.'s Opp'n at 7 (quoting Def.'s Opp'n, Ex. 1 (Gruntmeir Decl.) ¶ 4), and "the fact that the communication involved a 'personnel matter' does not mean there is no attorney-client privilege[,]" id.  After all, as the defendant states, "[the p]laintiff in an employment litigation cannot [reasonably] suggest that an employment matter could not possibly involve matters of a legal nature."  Id.

The attorney-client privilege "protects confidential communications made between clients and their attorneys when the communications are for the purpose of securing legal advice or services[,]" In re Lindsey, 158 F.3d 1263, 1267 (D.C. Cir. 1998), and "only communications that seek 'legal advice' from 'a professional legal adviser in his capacity as such' are protected[,]" id. at 1270.  Specifically, the communication must be made "for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding[.]"  In re Sealed Case, 737 F.2d 94, 98–99 (D.C. Cir. 1984).  Finally, although legal counsel may provide a mix of legal and business advice, "[s]o long as obtaining or providing legal advice was one of the significant purposes of the [communication], the attorney privilege applies[.]"  In re Kellogg Brown & Root, Inc., 756 F.3d 754, 758–59 (D.C. Cir. 2014).  This "significant purpose" determination

> cannot and does not draw a rigid distinction between a legal purpose on the one hand and a business purpose on the other. After all, trying to find the one primary purpose for a communication motivated by two sometimes overlapping purposes (one legal and one business, for example) can be an inherently impossible task.

Id. at 759 (emphasis in original). Although there may be situations where an attorney is acting in primarily a business capacity, and therefore communications with that attorney in that context would not be privileged, see Neuder v. Battelle Pac. Nw. Nat'l Lab'y, 194 F.R.D. 289, 293 (D.D.C. 2000) (concluding that the privilege did not apply where the attorney participated in the decision-making process of a personnel review committee whose "primary function . . . was to determine appropriate employment action to take against an employee"), "[t]he question that needs to be asked is not whether personnel decisions are business decisions, but rather whether the [material] at issue would reveal confidential communications . . . that were made for the purpose of securing legal advice[,]" United States ex rel. Fago v. M & T Mortg. Corp., 238 F.R.D. 3, 11 (D.D.C. 2006) (finding that the privilege applied where the attorney "appear[ed] to have been acting as a legal advisor when [he or she] investigated and made recommendations regarding the personnel decisions at issue").

Here, the Court concludes that the OGC served in a primarily legal capacity in providing legal advice regarding the plaintiff's termination to the OAWP. Although the OGC's counsel's advice concerned a personnel decision—namely the drafting of the notice of proposed termination—these communications took place during the course of ongoing litigation related to the plaintiff's employment. See generally Pl.'s Mot., Ex. 6 (Privilege Log) (indicating dates of creation that occurred after the instant litigation was commenced). Thus, the timing of the communications, combined with the descriptions of the attorney's involvement in the privilege log, indicate that the OGC was essentially providing a "legal sufficiency review" and legal advice regarding the implications of terminating the plaintiff's employment. See Jones, 2018

12

WL 11410070, at *13 ("Confidential communications from agency representatives to agency counsel requesting legal sufficiency review of draft proposed adverse personnel actions, and agency counsel's responses thereto . . . are plainly protected by the attorney-client privilege."). The privilege log entries reflect that the OGC "[p]rovid[ed] legal advice on [the] process" for various aspects of the proposed termination process, Pl.'s Mot., Ex. 6 (Privilege Log) at 1; see id. at 2, "[p]rovid[ed] legal advice on statutory requirements[,]" id. at 1; see id. at 2, provided "legal review of [the] draft proposed removal[,]" id. at 2; see id. at 3–4, and "[r]elay[ed] legal authority advice[,]" id. at 3, throughout the decision-making process regarding termination of the plaintiff's employment and the drafting of the notice of proposed removal. These communications demonstrate a primarily legal function considering that, although these communications involve the process underlying an ultimate personnel decision, their disclosure "would reveal confidential communications . . . that were made for the purpose of securing legal advice[,]" M & T Mortg. Corp., 238 F.R.D. at 11, related to that personnel decision. Therefore, the communications serve a primarily legal function. See id. Accordingly, the Court concludes that the communications at issue are protected from disclosure by the attorney-client privilege.

### 3. Attorney Work-Product Privilege

The plaintiff argues that the "[d]efendant cannot rely on the work-product privilege where decisions and communications by counsel were part of the discriminatory decision-making[,]" Pl.'s Mot. at 9, and asserts the defendant "can only make a work-product argument by putting on the record and conceding that it knew [the plaintiff]'s termination would result in litigation due to decisions counsel itself was participating in[,]" id. at 8–9 (emphasis omitted). In response, the defendant provides a single footnote in his opposition. See Def.'s Opp'n at 8–9 n.4 (citing Willingham v. Ashcroft, 228 F.R.D. 1 (D.D.C. 2005)). The defendant contends that the "OGC's legal review was performed in reasonable anticipation of litigation[,]" as evidenced by

13

the fact that the "[p]laintiff had brought EEO claims, brought an action before the Merit Systems Protection Board, and filed this instant litigation in federal court by the time OGC attorneys were conducting legal review of the proposed removal action." Id.

The attorney work-product privilege protects materials prepared "in anticipation of litigation." Fed. R. Civ. P. 26(b)(3); see Coastal States Gas Corp., 617 F.2d at 864 (stating that the work-product privilege is limited to "materials 'prepared in anticipation of litigation or for trial.'" (quoting Jordan v. U.S. Dep't of Just., 591 F.2d 753, 775 (D.C. Cir. 1978)). Thus, the attorney's purpose for preparing the materials is the operative consideration, and "the 'testing question' for the work-product privilege . . . is 'whether in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" In re Sealed Case, 146 F.3d 881, 884 (D.C. Cir. 1998) (quoting Senate of the Com. of Puerto Rico ex rel. Judiciary Comm. v. U.S. Dept. of Just., 823 F.2d 574, 586 n.42 (D.C. Cir. 1987)).

Additionally, courts in this jurisdiction apply a "specific claim" test to questions involving the work-product privilege, which is satisfied "when government lawyers 'prepare[] a document in the course of an active investigation focusing upon specific events and a specific possible violation by a specific party[.]'" Id. at 885 (quoting SafeCard Servs., Inc. v. U.S. Secs. & Exch. Comm'n, 926 F.2d 1197, 1203 (D.C. Cir. 1991)); see also Coastal States Gas Corp., 617 F.2d at 863 (finding that legal memoranda prepared by government counsel analyzing regulations in connection with an ongoing investigation by agency auditors constituted protected work-product). Moreover, materials have also been found to constitute attorney work-product where the attorney "rendered legal advice in order to protect the client from future litigation about a particular transaction[,]" even though there was not a specific claim lodged at the time.

In re Sealed Case, 146 F.3d at 885; see Delaney, Migdail & Young, Chartered v. Internal Revenue Serv., 826 F.2d 124, 127 (D.C. Cir. 1987) (concluding that the work-product privilege applied where the attorney "advise[d] the agency of the types of legal challenges likely to be mounted against a proposed program, potential defenses available to the agency, and the likely outcome").

Here, the documents the plaintiff seeks to acquire are limited to those created during the decision-making process leading up to the plaintiff's proposed termination, as well as the drafting of the notice of his proposed termination. See Pl.'s Mot. at 1 (seeking to "compel discovery of documents and information redacted or withheld by [the d]efendant . . . [and] demanded by [the p]laintiff on the basis of various privileges"); id. at 3 (describing the withheld documents as "documents relating to [the d]efendant's proposed termination"). The vast majority of these documents were created between April 2018 and March 2019. See id. at 3 (describing the drafting process as occurring between April 2018 and March 2019). The plaintiff filed this case on June 4, 2018, see Compl. at 1, and therefore, because litigation was ongoing when the documents were created, they "can be fairly said to have been prepared . . . because of the prospect of litigation[,]" Senate of the Com. of Puerto Rico, 823 F.2d at 586 n.42; see generally Pl.'s Mot., Ex. 6 (Privilege Log) (indicating dates of creation that occurred after this case commenced); id. at 10 (lodging specific objections to communications, most of which were created after this case was initiated). Furthermore, to the extent that any documents requested by the plaintiff and withheld by the defendant on the basis of the work-product privilege were created before this litigation commenced, they concerned the decision-making process and drafting process leading up to the plaintiff's proposed removal, see supra Section III.B.1, and therefore constitute material involving "legal advice in order to protect the client from future

litigation about a particular transaction," In re Sealed Case, 146 F.3d at 885, namely, the plaintiff's proposed termination. Accordingly, the Court concludes that the documents sought by plaintiff are also protected from disclosure by the work-product privilege.

### 4. Deliberative Process Privilege

The plaintiff argues that "[the deliberative process] privilege does not apply to the facts and circumstances underlying a discrete employment action." Pl.'s Mot. at 10. In response, the defendant argues that the documents at issue qualify as "predecisional" and "deliberative," qualifying them as protected by the deliberative process privilege, see Def.'s Opp'n at 9, and that "[c]ourts have regularly protected deliberative documents in the employment context[,]" id. at 10 (citing cases).

The deliberative process privilege protects from disclosure "documents reflecting advisory opinions, recommendations[,] and deliberations comprising part of a process by which governmental decisions and policies are formulated." Nat'l Lab. Rels. Bd. v. Sears, Roebuck & Co., 421 U.S. 132, 150 (1975) (internal quotation marks omitted). To qualify for protection under the deliberative process privilege, the agency must show that a document is both (1) predecisional, and (2) deliberative. Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 39 (D.C. Cir. 2002). "A document is 'predecisional' if it precedes, in temporal sequence, the 'decision' to which it relates." Senate of the Com. of Puerto Rico, 823 F.2d at 585. "Material is deliberative if it 'reflects the give-and-take of the consultative process.'" Petroleum Info. Corp. v. U.S. Dep't of Interior, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting Coastal States Gas Corp., 617 F.2d at 866). The "key question" in determining whether the material is deliberative "is whether disclosure of the information would 'discourage candid discussion within the agency.'" Access Reps. v. Dep't of Just., 926 F.2d 1192, 1195 (D.C. Cir. 1991)

(quoting Dudman Commc'ns Corp. v. Dep't of Air Force, 815 F.2d 1565, 1568 (D.C. Cir. 1987)).

Here, the defendant argues that the drafts of the notice of proposed removal fall under the deliberative process privilege because they were generated "prior to the issuance of the final notice or letter of proposed removal," and are thus pre-decisional. Def.'s Opp'n at 9–10. The defendant further argues that the drafts fall within the deliberative process privilege because they "concern deliberations regarding the content of the final notice or letter of proposed removal[,]" and are thus deliberative. Id. The Court agrees that the requested documents are pre-decisional in that they pre-date the defendant's official decision to terminate the plaintiff in March 2019.[5] See Pl.'s Mot. at 3 ("In March 2019, [the] OAWP issued a formal recommendation that [the plaintiff] be terminated, and on March 7, 2019, Reid served on [the plaintiff] a Notice of Proposed Termination."). Furthermore, although "courts have [ ] held the deliberative process privilege 'should be invoked only in the context of communications designed to directly contribute to the formulation of important public policy[,]'" Pl.'s Reply at 8 (quoting Nat'l Cong. for Puerto Rican Rts. ex rel. Perez v. City of New York, 194 F.R.D. 88, 95 (S.D.N.Y. 2000)), the privilege has in fact been applied to situations involving employment decisions concerning individual employees. Indeed, the defendant cites to cases where the deliberative process privilege was applied to situations regarding a party's employment involving: an EEO decision, see Broderick v. Shad, 117 F.R.D. 306, 311 (D.D.C. 1987), an investigative report, see Sourgoutsis v. U.S. Capitol Police, 323 F.R.D. 100, 113 (D.D.C. 2017), and a promotion

---

[5] The plaintiff argues that these materials might not be pre-decisional because "the point at which the 'decision' to terminate [the plaintiff] [was made] is in dispute" due to testimony that the decision was made in the spring and summer of 2018. Pl.'s Reply at 8. However, the plaintiff's position that a decision was reached prior to the ultimate notice of proposed termination appears speculative and the Court will treat the actual issuance of the notice of proposed termination as the final "decision" for purposes of the determining whether the documents at issue are pre-decisional.

decision, see Wadelton v. Dep't of State, 106 F. Supp. 3d 139, 153 (D.D.C. 2015).  See Def.'s Opp'n at 10–11.  And, as with the decision processes in those cases, the back-and-forth exchange of information, opinions, and discussions prior to the notice of proposed termination being issued in this case constitutes a deliberative process leading up to an ultimate agency decision.  Furthermore, having concluded that discrete employment actions may be considered deliberative, the Court also concludes that "disclosure of the information [at issue] would 'discourage candid discussion within the agency'" regarding employment decisions.  Access Reps., 926 F.2d at 1195 (quoting Dudman Commc'ns Corp., 815 F.2d at 1568).

Accordingly, the Court concludes that the requested documents are protected by the deliberative process privilege.  Therefore, because the documents and communications at issue are protected by the attorney-client, work-product, and deliberative process privileges, they are exempt from disclosure.

**C.    The Plaintiff's Request for Comparator Information**

Having addressed the defendant's asserted privilege claims, the Court now turns to the plaintiff's requests for production of previously-requested comparator information.  See Pl.'s Mot. at 10–11.  Specifically, the plaintiff seeks "basic comparator information of instances of termination recommendations by [the] OAWP . . . and referrals from [the] OSC of disciplinary actions[.]"  Id. at 10.  The defendant responds that the plaintiff's requests "do not seek actual comparator information and are not proportional to the needs of the case."  Def.'s Opp'n at 11.

"Comparator information" in the employment context generally refers to information sought in order to find potential "evidence suggesting that the employer treated other employees of a different race, color, religion, sex, or national origin more favorably in the same factual circumstances."  Brady v. Off. of Sergeant at Arms, 520 F.3d 490, 495 (D.C. Cir. 2008).

18

However, in order to show that the difference in treatment was due to a discriminatory factor, this information should generally be limited to factually similar circumstances or employees that are similarly situated to the plaintiff that is requesting the information.  See, e.g., Chatman v. Purdue, No. 17-826, 2020 WL 1170230, at *3 (D.D.C. Mar. 11, 2020) (granting request for information related to candidates who the plaintiff alleged "unfairly received positions over her" due to a discriminatory factor); Breiterman v. U.S. Capitol Police, 324 F.R.D. 24, 32–33 (D.D.C. 2018) (denying motion to compel regarding a request for "all [United States Capitol Police] employees who, in the past five [ ] years, have been discharged for discrimination, misconduct, protected disclosures, retaliation and/or free speech" because this request "cast[] too wide a net"); Murphy v. Price WaterhouseCoopers, LLP, Nos. 02-0982, 05-1054, 2006 WL 8446472, at *5 (D.D.C. May 22, 2006) (allowing discovery of comparator information for employees outside of the plaintiff's small practice unit where the requested information concerned "similarly situated employees").

      Here, the Court concludes that the information requested by the plaintiff casts too broad a net to constitute valid comparator information because it does not seek information related to "similarly situated" employees or situations to that of the plaintiff.  See id.  Because the request is therefore "not tailored to identify comparators," Breiterman, 324 F.R.D. at 32, the requested information would not reasonably assist the plaintiff in "establish[ing] pretext masking a discriminatory motive by presenting 'evidence suggesting that the employer treated other employees of a different race . . . more favorably in the same factual circumstances[,]'" Burley v. Nat'l Passenger Rail Corp., 801 F.3d 290, 301 (D.C. Cir. 2015) (quoting Brady, 520 F.3d at 495); see Brady, 520 F.3d at 495 (defining valid comparator information as that which would "suggest[] that the employer treated other employees of a different race, color, religion, sex, or

national origin more favorably <u>in the same factual circumstances</u>" (emphasis added)). Additionally, as phrased, the requests for <u>all</u> termination recommendations made by the OAWP and <u>all</u> referrals from the OSC of disciplinary actions are overly broad and, as the defendant aptly notes, "are not proportional to the needs of the case." Def.'s Opp'n at 11. "Trial courts have a broad discretion in discovery matters[,]" <u>In re Multi-Piece Rim Prods. Liab. Litig.</u>, 653 F.2d 671, 679 (D.C. Cir. 1981), and, exercising that discretion here, the Court concludes that it must deny the plaintiff's request for what he has mischaracterized as comparator information.

### IV.     CONCLUSION

For the foregoing reasons, the Court concludes that it must deny the plaintiff's motion to compel.

**SO ORDERED** this 19th day of July, 2022.[6]

REGGIE B. WALTON<br>
United States District Judge

---

[6] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.